IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| Thomas Mervyn, on behalf of himself and all others similarly situated,<br>    Plaintiffs,<br>v.<br>Atlas Van Lines, Inc. and Ace World Wide Moving & Storage Co., Inc., individually and on behalf of all others similarly situated,<br>    Defendants. | Case No: 13 C 3587<br><br>Judge Ronald A. Guzmán |

## MEMORANDUM OPINION AND ORDER [REDACTED]

For the reasons stated below, Defendants' motion for summary judgment as to Thomas Mervyn [246] is granted. All pending motions are denied as moot. Civil case terminated.

### STATEMENT

This case involves a compensation dispute between truck owner-operators and the agents who hire them to transport household goods. Thomas Mervyn seeks relief both on his own behalf as well as others similarly situated; however, no class has been certified.

### I. Background

The relevant regulatory background is as follows, as set forth in the parties' briefs. The federal Motor Carrier Act authorizes the Department of Transportation to regulate trucking companies, known as Carriers, that transport household goods across state lines. 49 U.S.C. § 14104. Carriers often contract with Agents, who then contract with truck owners, known as Owner-Operators, to transport the goods. *Id.* § 13907. The services are provided by the Owner-Operators pursuant to the terms of lease agreements, which are governed by federal Truth in Leasing regulations. *Id.* § 14102; 49 C.F.R. § 376. As is relevant here, the regulations provide that the lease must "clearly state[]" "[t]he amount to be paid by the authorized carrier for equipment and driver's services." 49 C.F.R. 376.12(d). The amount "may be expressed as a percentage of gross revenue . . . or by any other method of compensation mutually agreed upon by the parties to the lease." *Id.*

### II. Facts

Ace is an Atlas Agent and leases the trucks and driving services of Owner-Operators to haul certain Atlas shipments. (Pl.'s Resp. Defs.' Stmt. Facts, Dkt. # 254, ¶¶ 3, 4.) Thomas

Mervyn is an individual Owner-Operator who leased his truck and driving services to several of Ace's separate corporations at different times. (*Id.* ¶ 6.) Federal law requires that Atlas publish tariffs showing the rates for each task in a move. (*Id.* ¶ 15.) One rate is for "linehaul," which is based on the weight of the goods and the distance they are shipped. (*Id.* ¶ 16.) Other rates cover fuel surcharge, full value protection for goods, packing and unpacking, storage, and other tasks, not all of which apply on every shipment. (*Id.* ¶ 17.) Because the tariff rates are only a ceiling on what may be charged, Atlas, like other Carriers, often negotiates significant discounts off tariff rates to win customers' business. (*Id.* ¶¶ 18, 19.) The discounts vary by amount and type from shipment to shipment, and may include an across-the-board discount on all tariff items or a discount on a particular item, such as linehaul. (*Id.* ¶¶ 20-22.) In addition to the discounts, Atlas might provide a service for free. (*Id.* ¶ 23.) The discounts and free services may be mixed and matched in a single shipment. (*Id.* ¶ 24.) After a shipment is completed, Atlas collects money from the customer and distributes that revenue among the various Agents involved in the shipment, retaining a portion of it where applicable. (*Id.* ¶ 25.) If the hauling agent used an Owner-Operator to haul the goods, the hauling agent pays the Owner-Operator under the terms of the hauling agent's lease with the Owner-Operator. (*Id.* ¶ 26.) An Agent's share of the revenue is based on the services it performed. (*Id.* ¶ 27.)

According to Atlas, because it needed a way to distribute the costs of providing discounts across the various Agents involved in a shipment, it instituted the "effective bottom line discount" (or "EBLD") policy to distribute the costs of providing discounts across all participants in the shipment. (*Id.* ¶ 29.) Plaintiff contends that "Atlas used 'freebies' and rebates, neither of which are discounts, to siphon revenue to itself at the expense of owner-operators." (*Id.*) In other words, Plaintiff does not contest the application of the EBLD method to allocate the costs of discounts across all participants in a shipment; he asserts that the inclusion by Atlas of services it provided for free (*i.e.*, 100% discount) was both a breach of the Lease and a violation of the federal Truth in Leasing regulations.

Atlas also uses a "predetermined effective bottom line discount" (or "PBLD"), which is as an estimate of what the EBLD will be for a given customer over a series of shipments. (*Id.* ¶ 30.) Under the EBLD policy, Atlas divides the total dollar value of the discounts provided to the customer by the total maximum dollar value of that particular shipment using tariff rates, and Atlas multiplies that EBLD percentage by the tariff charges for each Agent to determine how much that Agent should receive. (*Id.* ¶ 31.) The "bottom line discount" is the percentage discount from the tariff rate, referred to in some documents as "BLD," and is distinct from the effective bottom line discount, which is the ultimate financial result of a shipment after taking into account all discounts, rebates, free services, and other unbilled expenses (like credit card fees). (*Id.* ¶ 32.) Atlas does not specify how Agents are to pay Owner-Operators. (*Id.* ¶ 33.)

Defendants set forth the following example. In the ▓▓▓ shipment that Mervyn hauled for Ace 1547, Atlas gave the customer a ▓▓ across-the-board, bottom line discount. The gross amount of ▓▓▓▓ for the shipment was thus billed to the customer at ▓▓▓▓. (*Id.* ¶ 38.) There were certain line items, however, for which Atlas did not allocate a charge to the customer: in the ▓▓▓ shipment it was for moving "bulky articles." (*Id.* ¶ 39.) The customer received a

2

100% discount for that service. (*Id.*) If an Agent's compensation depended solely on what Atlas allocated to a particular service on the client invoice, Atlas would not have distributed any money to the Agent for those services for which no charge was allocated. (*Id.* ¶ 40.) By instead applying EBLD, and spreading the cost of this and other discounts across all participants, Atlas allocated some of the revenue to bulky articles and paid all of that to Ace; Ace, in turn, paid Mervyn his contractual share, ███, for the bulky article. (*Id.* ¶ 41.) Had Atlas not applied EBLD, the Agent and Mervyn would have received nothing for that service. (*Id.* ¶ 42.)

Atlas documents the customer's payments, the discounts applied, and the amounts to be distributed to Agents in a computer system, which during the time at issue, produced the Rating Invoice and Distribution System (or "RTDS"), an electronic document displaying the amounts billed to the customer and the amounts distributable from the shipment after application of the EBLD method. (*Id.* ¶¶ 43-44.) The information in the RTDS screen was used to generate a document called the "Financial Result," which is an internal Atlas document that contains tables called "Invoice Distribution" and "Payable Distribution." (*Id.* ¶ 45.) The Invoice Distribution lists the charges made to Atlas's customers before certain unbilled amounts, such as rebates or credit card fees, were applied and before Atlas applied the EBLD method to account for all unbilled amounts. (*Id.* ¶ 46.) The Payable Distribution lists the charges after the application of the EBLD calculation. (*Id.* ¶ 47.)

Plaintiff's lease with Ace World Wide Moving, Inc.[1] ("Lease") stated that Plaintiff "shall earn compensation as provided in the schedule of compensation included in Schedule B" attached to the Lease. (*Id.* ¶ 50.) Plaintiff hauled interstate shipments of household goods, which are governed by Schedule B-1. (*Id.* ¶ 53.) On Schedule B-1, included under a heading entitled "Payments to Contractor," it states that "[t]he following definitions and general rules are applicable to the determination of compensation." (*Id.* ¶ 53.) The "general rules" listed under "Payments to Contractor" state, in part: "Linehaul and accessorial service charges shall be determined by applying the applicable effective or predetermined effective bottom line discount (determined under Atlas' rules) to the transportation and accessorial charges for each shipment." (*Id.* ¶ 54.) Below the "general rules," Schedule B-1 stated that Plaintiff was entitled to "Linehaul 58%." (*Id.* ¶ 56.) The Lease provided that Ace would pay Plaintiff "100%" of the "Fuel Surcharge." (*Id.* ¶ 57.) Atlas's various customer contracts permitted it to charge customers a fuel

---

[1] This entity, Ace World Wide Moving Inc., is different from the defendant named in the caption, Ace World Wide Moving & Storage Co., Inc. Defendants contend that Plaintiff has named the wrong entity because he never had a lease contract with Ace World Wide Moving & Storage Co., Inc., during the relevant time period – only with Ace World Wide Moving, Inc. According to Defendants, they notified Plaintiff on at least two occasions that Plaintiff had named the wrong party, but Plaintiff did not amend his complaint to name the correct defendant. To the extent Defendants move for summary judgment on behalf of the named defendant, Ace World Wide Moving & Storage Co., Inc., because it was not a party to the relevant Lease, the motion is granted. Nevertheless, the Court also addresses the arguments for summary judgment based on the relevant language in the Lease.

3

surcharge for rising fuel prices. (*Id.* ¶ 58.)

Although the customer contracts set out the tariff rate applicable to a shipment, including the fuel surcharge, customers often negotiated with Atlas to discount the fuel surcharge below the tariff rate. (*Id.* ¶ 59.) Atlas negotiated this discount separately with each customer and reflected the discount in each customer's unique contract. (*Id.* ¶ 60.) Whatever amount the customer paid in fuel surcharge was paid in full to Mervyn; neither Atlas nor Ace retained any of that revenue. (*Id.* ¶ 61.)

Mervyn received documentation with regard to each shipment, showing both what he was paid and what the customer was billed. (*Id.* ¶ 62.) The documentation included a "Settlement Sheet" showing Mervyn the amount of his compensation for each element. (*Id.* ¶ 63.) The documentation also included an RTDS screen showing the amount invoiced to the customer, the BLD applied on the invoice to the customer, the EBLD- or PBLD-calculated amounts for each element of the shipment, and all services provided to the customer (including free services), as well as the EBLD or PBLD percentage (also expressed as the "Shared %"). (*Id.* ¶ 64.)

For example, in the ▮ shipment, the RTDS screen showed a "net billed" linehaul of ▮, but a distributable charge of ▮; and the Settlement Sheet then showed that Mervyn was paid ▮, which was 58% of the distributable charge (▮), not the "net billed" amount (▮). (*Id.* ¶ 65.) The RTDS screen and Settlement Sheets also showed that Mervyn was paid based on the fuel surcharge actually paid by the customer, rather than the tariff rate fuel surcharge. (*Id.* ¶ 66.) For example, in the ▮ shipment, the RTDS screen showed a "gross billed" amount (*i.e.*, tariff charge amount) of ▮ and a "net billed" amount (*i.e.*, post-discount amount) of ▮, and the Settlement Sheet showed that Mervyn was paid the ▮. (*Id.* ¶ 67.) The documentation also included a computer-generated equivalent of the rated freight bill (customer invoice), referred to as the Rate Audit Review screen ("RIRA"), showing the amounts invoiced to the customer. (*Id.* ¶ 68.)

Paragraph 11(e) of the Lease provided: "At the time of each payment to Contractor, [Agent] shall provide a copy of a document in the form and using the designation established by [Agent], representing an accounting of the financial accounts and transactions between Company and [Agent]." (*Id.* ¶ 69.) Paragraph 11(f) of the lease provided: "Financial entries made by [Agent] on payment documents shall be conclusively presumed correct and final if not disputed by Contractor within 30 days after distribution. On the date 30 days after distribution, such documents shall constitute the primary and/or prima facie business record between [Agent] and the Contractor with respect to financial transactions existing between the parties as reflected on the statements, and additional underlying documentation, in support of the documents, shall not be required as a matter of proof before any administrative or judicial tribunal." (*Id.* ¶ 70.) Although Plaintiff hauled more than 100 shipments for various Ace corporations, he only hauled 7 shipments for Ace 1547 from May 14, 2009, to May 14, 2013. (*Id.* ¶ 71.) Plaintiff once disputed the amounts he was owed for waiting time and fuel for a shipment that was cancelled in September 2008. (*Id.* ¶ 72.) In June 2009, he also disputed a 4% charge for insurance that was deducted from his compensation. (*Id.* ¶ 73.) Plaintiff admits that he never disputed in writing any

of his compensation for linehaul and fuel surcharge that he now complains was incorrect, but contends that he "repeatedly disputed orally that Defendants were not paying him correctly. . . ." (*Id.* ¶ 74.)

In Count I of his amended complaint, Plaintiff alleges a violation of 49 C.F.R. § 376.12(d), which provides that the "amount to be paid by the authorized carrier for equipment and driver's services shall be clearly stated on the face of the lease or in an addendum which is attached to the lease [agreements]." (1st Am. Compl., Dkt. # 55, ¶ 25.)[2] Specifically, Plaintiff alleges that Defendants:

> fail[ed] to disclose in the lease agreements that the line haul and accessorial service amounts used to calculate owner-operator compensation would be less than the amounts of the actual line haul and accessorial service charges, or in other words, that two separate and different discounts would be applied to determine two separate line haul amounts—one to be charged the customer (the actual line haul amount); the other to be used to calculate owner operator compensation (the understated line haul amount).

(*Id.* ¶ 26.) According to Plaintiff, Defendants "appl[ied] undisclosed additional deductions and/or discounts, which were not identified in the lease agreements, to the actual line haul and accessorial service charges upon which owner operator compensation was supposed to be based." (*Id.* ¶ 27.) Count II alleges a breach of the Lease based on the same argument.

Counts III and IV allege violations of 49 C.F.R. § 376.12(d) and breach of the Lease, respectively, and contend that the Lease provides that owner-operators were to receive "100% of the Fuel Surcharge," but that the owner-operators received less than the designated 100% "as a result of the application of an undisclosed discount to the Fuel Surcharge amount." (*Id.* ¶¶ 37, 39.)

### III. Standard

Summary judgment is appropriate where the moving party establishes that there is no genuine issue as to any material fact and he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, we "construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen'l Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013). "[S]urviving summary judgment requires evidence, not assumptions;" "mere speculation or

---

[2] According to Defendant, Plaintiff transported over 100 shipments for various Ace entities between 2005 and 2009; this lawsuit, however, challenges only the last seven shipments given the four-year statute of limitations under the Motor Carrier Act. *See* 28 U.S.C. § 1658(a).

conjecture" is insufficient to create a factual dispute to defeat summary judgment. *Thornton v. M7 Aerospace LP*, 796 F.3d 757, 768-69 (7th Cir. 2015) (internal citations and quotations omitted).

## IV. Analysis

### A. Breach of Contract

Plaintiff contends in Counts II and IV that he was paid less both for linehaul and other accessorial charges as well as the fuel surcharge than he should have received under the terms of the Lease. Defendants argue that Plaintiff's claim is barred by the provision in ¶ 11(f) of the Lease requiring Plaintiff to raise any disputes regarding his compensation within thirty days of distribution of the financial entries made on payment documents sent by Ace to Plaintiff.

As noted above, ¶ 11(f) of the Lease provided:

> Financial entries made by [Agent] on payment documents shall be conclusively presumed correct and final if not disputed by Contractor within 30 days after distribution. On the date 30 days after distribution, such documents shall constitute the primary and/or prima facie business record between [Agent] and the Contractor with respect to financial transactions existing between the parties as reflected on the statements, and additional underlying documentation, in support of the documents, shall not be required as a matter of proof before any administrative or judicial tribunal.

"When the terms of a contract are clear and unambiguous, [the Court] construe[s] the contract's language according to its literal meaning." *Ash Park, LLC v. Alexander & Bishop, Ltd.*, 866 N.W.2d 679, 685 (Wis. 2015).[3] Further, "contract language is construed according to its plain or ordinary meaning." *Id*. Here, the plain language of § 11(f) is clear: "Financial entries made by [Agent] on payment documents shall be conclusively presumed correct and final if not disputed by Contractor within 30 days after distribution." It is uncontested that Plaintiff did not dispute his compensation as set forth on the payment documents until he filed the instant lawsuit, which was approximately four years after he hauled his last shipment for Ace. As noted by another district court addressing the same provision (although with a 180-day dispute time frame rather than 30 days), the "language plainly means that if Mervyn fails to contest the accuracy of his payment documents–including what he was owed under the lease and the basis for calculating those amounts–within 180 days of receiving them, then he cannot later argue that the payment documents incorrectly set forth what he was owed for those shipments." *Mervyn v. Nelson Westerberg, Inc.*, No. 11 C 6594, 2016 WL 1270416, at *4 (N.D. Ill. Mar. 31, 2016) (citing *Bays Exploration, Inc. v. PenSa, Inc.*, 2012 WL 4128120, at *14 (W.D. Okla. Sept. 18, 2012) (holding that the results of an audit conclusively established the amount that one party owed under an

---

[3] The parties agree that Wisconsin law governs the terms of the Lease.

agreement, where the agreement included a provision stating that "all bills and statements rendered . . . during any calendar year shall conclusively be presumed to be true and correct after twenty-four . . . months following the end of such calendar year, unless within [that period] a Non-Operator takes written exception thereto . . . "); *CabelTel Int'l Corp. v. Chesapeake Exploration*, LLC, 2012 WL 2849289, at *5 (Tex. App. July 12, 2012) (holding that billing statements correctly described the amount that one party owed under an agreement with the same provision); *Grynberg v. Dome Petrol. Corp.*, 599 N.W.2d 261, 266-67 (N.D. 1999) (holding, in a suit over a contract containing the same clause, that because it was "undisputed [that the plaintiff] did not make a written exception to [the defendant's] costs within that time," the defendant's "expenditures . . . were conclusively presumed true and correct" for the purposes of the suit)).[4]

This Court agrees: Because Plaintiff did not dispute the entries, they are presumed correct, and Plaintiff cannot now challenge their accuracy. *Id.* at *4 (noting that § 11(f) "does not prohibit Mervyn from suing [the defendant] unless he complains about his payment documents within 180 days; rather, it merely establishes the accuracy of the payment calculations in those documents."). The Court notes that Plaintiff does not claim that Defendants failed to pay him; rather, he claims that he was paid less than he believes he was due pursuant to the terms of the Lease. (Pl.'s Resp. Defs.' Stmt. Facts, Dkt. # 254, ¶¶ 76-77.) Because that assertion is barred by the plain and clear language in the Lease, Plaintiff's breach of contract claim fails.

Plaintiff attempts to salvage his breach of contract claims by contending that the 30-day time period that he had to challenge payments is unreasonably short and unenforceable. *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 874 (7th Cir. 1997) ("The dominant view in contract law is that contractual limitations periods shorter than the statute of limitations are permissible, provided they are reasonable."). As an initial matter, *Doe* is not on point because § 11(f) is not a contractual limitations period since it does not bar Plaintiff from suing on the amount owed; it simply establishes the accuracy of that amount. *Mervyn*, 2016 WL 1270416, at *8 ("Section 11(f) does not purport to modify any statute of limitations for bringing suit."). Therefore, the concept of reasonableness in this context is inapplicable.

Moreover, "the court's role 'is not to make contracts or reform them but to determine what the parties contracted to do.'" *Ash Park*, 866 N.W.2d at 713 (citation omitted). "'It is not the function of the court to relieve a party to a freely negotiated contract of the burdens of a provision which becomes more onerous than had originally been anticipated." *Id.* at 713-14 (citation omitted). Plaintiff does not assert that he signed the Lease under duress or was fraudulently induced into signing it. It is not this Court's role to relieve Plaintiff of the 30-day dispute period to which he voluntarily agreed. "Retrospective buyer's remorse is not a legitimate basis to relieve

---

[4] While Defendants argue that Judge Feinerman's ruling in *Mervyn v. Nelson Westerberg, Inc.*, that the 180-day provision in Plaintiff's lease barred Plaintiff's claims, collaterally estops Plaintiff from challenging the 30-day provision in this case, the Court need not resolve the issue because it concludes that Plaintiff's breach of contract claims fail on the merits. *Id.*, 2016 WL 1270416, at *4.

7

a party from the terms of a clear contract that he or she has signed." *Raasch v. City of Milwaukee*, 750 N.W.2d 492, 498 (Wis. Ct. App. 2008) (citing *Rent–A–Center, Inc. v. Hall*, 510 N.W.2d 789, 792 n. 5 (Wis. Ct. App.1993) ("It is the 'firmly fixed' law in this state that, absent fraud, a person may not avoid the clear terms of a signed contract by claiming that he or she did not read or understand the contract.").[5]

Even assuming that § 11(f) did not bar Plaintiff's breach of contract claims,[6] the Court would still conclude that Defendants are entitled to summary judgment on all of Plaintiff's claims. Plaintiff claims that he was paid less than what he was entitled to under the terms of the Lease. As to linehaul charges, the Lease expressly states in the schedule entitled "Payments to Contractor" that "[l]inehaul and accessorial charges shall be determined by applying the applicable effective or predetermined effective bottom line discount (determined under Atlas' rules) to the transportation and accessorial charges for each shipment." (Defs.' Ex. B-1, Dkt. # 248-3, ACE000814.) The terms "applicable effective bottom line discount" or "predetermined effective bottom line discount" are not defined by the Lease, but are expressly indicated as being "determined under Atlas' rules." Defendants have submitted affidavits and deposition testimony in support of why and how they used the effective bottom line discount, which remain unrebutted by Plaintiff. Plaintiff's attempt to undermine the express terms of the contract or inject ambiguity into the Lease by contending that the Lease made only "vague references" to "effective bottom

---

[5] Further, Plaintiff acknowledges that he knew how linehaul and fuel surcharges were being paid from the time of his first shipment with Defendants. (Defs.' Ex. E, Dkt. # 248-6, Mervyn Dep., at 247-252.) Given this fact, Plaintiff could have sent the Defendants perfunctory emails or letters disputing the amounts paid as a matter of course after receiving the payment documents in order to preserve his rights under the Lease. Section 11(f) requires only that a payment be disputed within 30 days, not that the dispute be completely resolved within that period of time.

[6] Plaintiff contends that the 30-day dispute provision in § 11(f) is unenforceable because it violates the purpose of the Truth in Leasing regulations, which are intended to afford protections to Owner-Operators, citing *Al-Anazi v. Bill Thompson Transp., Inc.*, No. 15-CV-12928, 2016 WL 3611886, at *7 (E.D. Mich. July 6, 2016). In *Al-Anazi*, the Court denied the defendant's contention that a Lease provision stating that "[n]either party shall make any claim or demand of any nature on the other for matters arising out of this Agreement . . . if no written notice of that claim or demand has been sent to the other party within 90 days of the settlement statement" barred the owner-operator's claim, stating that the 90-day notice provision violated public policy. As an initial matter, the provision at issue in this case is distinguishable in that it does not prevent Plaintiff from bringing a claim; the relevant provision here only sets the amount at issue should Plaintiff challenge payment. In any event, the Court need not address the issue because it concludes, as noted, that Plaintiff's claims fail regardless of the validity of the 30-day dispute provision.

8

line discount" is unpersuasive.[7] The Lease uses the terms "effective bottom line discount" and "predetermined bottom line discount" throughout the compensation schedules. As already noted, a party is bound by a contract's clear terms, even if he does not understand them. *See Raasch*, 750 N.W.2d at 497-98 ("[I]f any of those who signed those releases had doubts as to the benefits they were getting in return for their relinquishing their rights to contest their entitlement to enhanced disability benefits that were sought in the . . . circuit-court cases referenced in the releases, they should have made further inquiry before they signed.").

The same is true with respect to the fuel surcharge. Schedule B-1 to the Lease provides that Plaintiff would be paid 100% of the fuel surcharge, and it is undisputed that Plaintiff was paid 100% of the fuel surcharge that was billed to the customer. For example, in the ▮▮▮ shipment, the gross billed amount, which is the tariff rate (*i.e.*, pre-customer discount), is shown on the payment documents as ▮▮▮. (Defs.' Ex. B-1, Dkt. # 248-3, ACE000555, 557, 878.) After the customer discount was applied to the tariff rate, the amount billed to the customer for the fuel surcharge was ▮▮▮, which was passed through and paid in full (*i.e.*, 100%) to Plaintiff. (*Id.*) Plaintiff's interpretation that he should have been paid 100% of the tariff amount is unsupported by any evidence and is inconsistent with his position on the other charges: On the one hand, Plaintiff acknowledges that he was to be paid his portion of the charges paid by the customer (not the tariff amount) for linehaul and other charges, but then states that he expected to be paid the full tariff amount for the fuel surcharge. Because such an interpretation is commercially unreasonable – it is unlikely that Atlas would agree to pay Plaintiff a fuel surcharge higher than that charged to the customer – and internally inconsistent, the Court declines to accept Plaintiff's reading of the Lease. *See Chapman v. B.C. Ziegler & Co.*, 839 N.W.2d 425, 431 (Wis. Ct. App. 2013) ("[W]e must interpret contracts to avoid unreasonable . . . results.").

### B. Violations of 49 C.F.R. § 376.12

Plaintiff also contends that the breach of the Lease itself violates § 376.12. Specifically, Plaintiff asserts that Defendants violated the Truth-in-Leasing regulations when they, "*in contravention of the Ace Lease*, . . . reduced owner-operated compensation by factoring in "freebies" and rebates – neither of which are discounts – in the process of calculating owner-operated linehaul compensation." (Pl.'s Resp., Dkt. # 265, at 9) (emphasis added). The Court, however, has concluded for the reasons stated above that this alleged conduct by Defendants did not breach the Lease. Because Plaintiff's allegation of a violation of the federal regulations is

---

[7] Indeed, the Court notes that Plaintiff's amended complaint alleges a breach of contract based on terms that were not in the Lease. Specifically, Plaintiff alleges in Count II that "the amounts of the *actual* line haul and accessorial service charges[] were *not* used to calculate owner operator compensation." (Am. Compl., Dkt. # 55, ¶ 32.) (second emphasis in original.) But the Lease does not refer to "actual" linehaul and accessorial service charges, and states instead that linehaul and accessorial service charges would be determined based on the applicable "effective or predetermined effective bottom line discount." Plaintiff does not dispute that these are the amounts he was paid.

based on a breach of the Lease, and the Court has found no such breach, Plaintiff's requests for relief under Counts I and III are denied.

## V. Conclusion

For the reasons stated above, Defendants' motion for summary judgment is granted.

**Date**: April 20, 2017

_____
**Ronald A. Guzmán**
**United States District Judge**